**EXHIBIT 1-D**

STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
DOCKET NO. CV-*21-196*

ANNIE VOORHEES,

      Plaintiff,

v.

AMERICAN AIRLINES, INC., JANE DOE FLIGHT
ATTENDANT, JOHN DOE MANAGER, and/or JANE DOE
1-5 and JOHN DOE 1-5,

      Defendants.

**COMPLAINT**

The Plaintiff, Annie Voorhees ("the Plaintiff"), complaining of the Defendants, American

Airlines, Inc. ("AA"), Jane Doe Flight Attendant ("Flight Attendant"), John Doe Manager

("Manager"), and Jane Does 1-5 and John Does 1-5 (Jane and John Does 1-5 referred to as "the

Doe Defendants"), alleges:

<u>PARTIES</u>

      1.     The Plaintiff is an adult, female individual residing in Kennebec County, Maine, of

Caucasian descent, physically overweight/voluptuous, and of modest socio-economic status.

      2.     In or about 2020, the Plaintiff made arrangements to travel out of state to see her

boyfriend in Philadelphia.  Given that she had a modest income and lifestyle, planning and paying

for the trip—and arranging for child care for her three (3) minor children—was a particularly

significant and expensive event for the Plaintiff.

AUGUSTA COURTS
NOV 22 '21 PM3:33

3.      AA is a major American airline with a principal place of business in Fort Worth, Texas, servicing approximately forty-seven (47) States in the Union, including the States of Maine and Pennsylvania.

4.      AA employs over 500 employees all over the Country.

5.      Venue is proper in this jurisdiction and with this Court because AA actively does and solicits business within the State of Maine; has a presence in and around the State soliciting business; and the Plaintiff purchased tickets from, through, or with AA from her home State of Maine and County of Kennebec.

6.      At all relevant times, Flight Attendant was an employee of or independent contractor working for AA as a stewardess, and whose identity is unknown to the Plaintiff.

7.      At all relevant times, Manager was an employee of or independent contractor working for AA in a managerial role, whose identity is unknown to the Plaintiff.

8.      The Doe Defendants are individuals whose identities are unknown to the Plaintiff and who are responsible for all or some of the acts and omissions complained of herein.

FACTS

9.      The Plaintiff is a Caucasian woman, overweight, has a voluptuous figure, and presents as – and in fact is – of relatively modest financial means.

10.     On or about December 4, 2020, a Friday, the Plaintiff checked onto an AA flight at Portland International Jetport ("PWM"), heading to Harrisburg, Pennsylvania, and connecting in Philadelphia.

11.    The Plaintiff's ticket was relatively inexpensive—a "bargain" type of fare—which, upon information and belief, the Defendants knew or learned of before the actions described below were taken.

12.    Since she was visiting her boyfriend, the Plaintiff was "dressed up" for the trip. She was wearing a black dress with a zippered top—which was not completely closed, resulting in her showing a fair amount of "cleavage"—boots with heels, and fishnet stockings.

13.    The Plaintiff flew from PWM to Philadelphia without incident.  The flight was small and, upon information and belief, consisted of most if not all Caucasian passengers; and most if not all Caucasian staff.

14.    In Philadelphia, the Plaintiff boarded the connecting AA plane, and was greeted by the Flight Attendant— an African American woman—who appeared to be in her 50s.

15.    The Plaintiff was seated toward the back of the aircraft.  There was an older, Caucasian man ("the Man") seated directly in front of the Plaintiff's seat, who the Plaintiff observed glaring at her (and her outfit) as she passed.

16.    When the Plaintiff sat down, the Man stood up suddenly and attempted to move seats.  The Flight Attendant went over to and conversed briefly with him, and then walked back to the Plaintiff.

17.    When she reached her, the Flight Attendant asked the Plaintiff in a loud voice, "Ma'am, are you okay?"

18.    The question was designed to, and did, cause the Plaintiff embarrassment, being sarcastic and directed at the Plaintiff's appearance rather than condition.

19.    The Plaintiff answered quietly that she was fine.

20.    The Flight Attendant left the area, following which a woman in an orange pinny (obviously sent by the Flight Attendant) walked to the back of the plane. The woman drew much attention from passengers; and went directly to the Plaintiff to ask if she would "cover up a little."

21.    The Plaintiff was humiliated and embarrassed and zippered her top almost all the way up. The woman left.

22.    Two to three minutes later, the Flight Attendant returned and loudly stated that, while she did not mean to embarrass the Plaintiff, the Plaintiff needed "to cover up."

23.    The Plaintiff hastily zippered her top as far up as it would go – which rendered it modest and not revealing – but the Flight Attendant insisted that the Plaintiff would have to put her coat on for the duration of the flight. The request was designed to humiliate and embarrass the Plaintiff further, and to cause additionally embarrassment and humiliation if agreed to, as most if not all passengers were not wearing their coats or jackets.

24.    The Plaintiff politely told the Flight Attendant that it was overly warm on the plane; that she often got hot; and that she would not be comfortable having to wear her coat for the entirety of the flight.

25.    The Flight Attendant left, and the Manager – an African American man – alighted the plane. He drew ample attention as he walked down the aisle to the Plaintiff's seat and asked her to gather her things and depart the aircraft with him.

26.    The Manager was or should have been aware that there were no other flights out to Harrisburg that day or for several days, and that the Plaintiff would be unable to reach her destination.

27.     Upon information and belief, the other passengers were led to believe that the Plaintiff had done something serious enough to warrant removal from the flight.

28.     The Plaintiff was humiliated, did not argue, and was escorted off the plane.

29.     Outside the gate, the Plaintiff asked the Manager if she would be permitted to reboard the plane if she were to put on her jacket, and the Manager said no.

30.     The Manager directed the Plaintiff to sit in a near-vacant gate area while her plane departed; and the airport emptied out.  The Manager stood for an extended period of time at the gate speaking to other employees, while the Plaintiff filmed live on Facebook, often breaking into tears as she described what was happening.

31.     During the unreasonably long wait, a small group of AA employees passed by, with one saying loudly to the Plaintiff, "You would have been allowed on our plane!"

32.     During that wait, the Manager was joking, laughing, and talking with coworkers and peers so as to extend the Plaintiff's wait and show her utter disregard.

33.     The Manager finally informed the Plaintiff that she was not being allowed to fly because her clothing was inappropriate and violated company policy.  When the Plaintiff asked calmly what policy it was, the Manager stated that he did not have it.

34.     Upon information and belief, the "policy" was one that the Manager did not know, and was vague, stating merely that a customer must "dress appropriately"; and that "offensive clothing" is not "allowed."

35.     The Plaintiff was caused to sit for another long stretch of time while the Manager allegedly attempted to "rebook" the Plaintiff on another flight.  Upon information and belief, the

Manager knew long before he took the Plaintiff off the flight that there was none other heading to her destination leaving that night, and that he could not rebook her.

36.     In spite of this, the Manager undertook this "search" for the express or reckless purpose of causing the Plaintiff the inconvenience and humiliation of sitting in an emptying airport for an extended period of time.

37.     After the airport was nearly vacant, the Manager informed the Plaintiff that AA would not be paying for a hotel for her since her removal from the flight was based upon her violation of the rules.

38.     The Manager also told her that AA wouldn't sponsor her overnight stay because AA had to assume that the Plaintiff would show up to the hotel dressed in an outfit that violated the hotel's dress policy.

39.     The latter statement was made out of animosity and with malice, as the Manager had no good faith basis for believing that the Plaintiff's outfit would "violate" a "dress code" at a hotel.

40.     The Manager did not advise the Plaintiff of how to get ground transportation to a hotel, or otherwise offer to assist her.

41.     The Manager finally informed the Plaintiff that there were no flights to Harrisburg for two (2) days—a fact he knew or should have known when he took her off the plane, and/or knew quickly upon his "rebooking" attempt.

42.     The Manager gave the Plaintiff no alternatives as to how to get to Harrisburg, leaving her to figure it out.  He told her that he had to book her at least twenty-four (24) hours later, on a Sunday morning flight.

43.     The Plaintiff was crying off and on throughout the process, continuing to video for Facebook Live. She explained to her audience that she had no money with which to stay at a hotel or secure substitute transportation to Harrisburg, or even to get to the hotel.

44.     Ultimately, the Plaintiff stayed in a hotel with funds that someone watching Facebook Live sent her.  She also borrowed funds to take a taxi to the motel, an Uber to the bus station the next day, a bus, and a taxi to her ultimate destination.

45.     The offending outfit was one that the Plaintiff had worn many times before and has worn many times since without incident.

46.     In or about 2021, the Plaintiff, through Counsel, wrote to AA, setting forth the foregoing and demanding that it compensate her for her monetary losses and predictable and severe emotional distress.

47.     AA refused to compensate her.

CAUSES OF ACTION

Count I:<br>Breach of Contract (AA)

48.      The Plaintiff repeats the foregoing.

49.     The Plaintiff entered into a valid and binding contract with AA pursuant to which she agreed to pay for, and AA agreed to provide, aviation transport from PWM to Harrisburg, PA.

50.     The Plaintiff fully performed her obligations under the contract, including obeying all rules of the airline, being cooperative, and following staff directives.

51.     In breach of its obligation under the contract, AA failed and refused to provide the Plaintiff with air transport from PWM to Harrisburg as agreed to and paid for.

52.     In further breach of its obligations under the contract, AA failed and refused to provide or help the Plaintiff with rebooking or hotel bookings due to its wrongful denial of her travel.

53.     As a result of AA's breach of contract, the Plaintiff suffered damage.

WHEREFORE, Plaintiff demands judgment against AA for such amount as is appropriate, with interest and costs.

Count II:<br>
Breach of the Implied Covenant of Good Faith and Fair Dealing (AA)

54.     The Plaintiff repeats the foregoing.

55.     The contract between the Parties carried with it the implied covenant of good faith and fair dealing.  This covenant required that AA not take any actions that were designed or certain to undermine the benefits to which the Plaintiff was entitled and expecting under the contract; and not take any actions in bad faith or with malice.

56.     AA breached the covenant by, *inter alia*, denying the Plaintiff transport based upon the Flight Attendant's subjective opinion that the Plaintiff was not properly dressed.

57.     AA further breached the covenant by permitting the Flight Attendant to kick the Plaintiff off the plane because, upon information and belief, she was Caucasian, overweight and/or voluptuous, of lesser socio-economic class and hence less likely to successfully challenge the action, and offensive to the Male whom the Flight Attendant viewed as a higher status.

58.     AA further breached the covenant by being unable to iterate why and which rules the Plaintiff allegedly broke to justify denying her travel.

59.     AA further breached the covenant by refusing to assist the Plaintiff – either financially or otherwise – in rebooking a flight or booking, paying for, and traveling to a hotel.

60.     The breaches of the implied covenant of good faith and fair dealing were taken

with actual malice, or in reckless disregard for the Plaintiff's rights.

WHEREFORE, Plaintiff demands judgment against AA for such amount as is appropriate,

with interest and costs, punitive damages, and attorney fees.

Count III:
Unjust Enrichment

61.     The Plaintiff repeats the foregoing.

62.     There was an enforceable contract between the Parties, which AA wrongfully

contended was breached by the Plaintiff.

63.     As AA accepted the Plaintiff's full payment for the entire airplane flight and only

performed 1/4 of it, AA was unjustly enriched by the Plaintiff's payment.

64.     AA's actions voided any value in the first 1/4 of the Plaintiff's trip by stranding her

in Harrisburg, Pennsylvania, at night, with no planes out for days and no way for her to afford a

hotel room on her own or pay for alternative travel.

65.     Permitting AA to retain the value of the tickets would be unjust.

66.     The only way justice would be served is if AA is ordered to return the funds that

the Plaintiff paid to her.

WHEREFORE, Plaintiff demands judgment against AA for such amount as is appropriate,

with interest and costs.

Count IV:

Intentional Infliction of Emotional Distress (AA/Flight Attendant/Manager)

67.     The Plaintiff restates the allegations set forth above.

68.     AA, the Flight Attendant and Manager took actions, singularly and collectively, designed or certain to cause extreme emotional suffering, humiliation, and anguish in the Plaintiff.

69.     Upon information and belief, the Flight Attendant was and is a middle-aged, conservative, African American woman, who noticed the Plaintiff for being overweight, voluptuous, and provocatively dressed, after the Man expressed displeasure with the Plaintiff's appearance.

70.     Upon information and belief, the Flight Attendant valued the Man as a customer more than she did the Plaintiff, as he was male, appeared to be higher class, and assumed to have paid more for his ticket and thus being a more valuable customer.

71.     Flight Attendant and Manager both knew that there were no "policies" that required or justified their actions in removing the Plaintiff from the aircraft for failing to wear her coat.

72.     Their actions included the Flight Attendant calling repeated attention to the Plaintiff through (a) loudly asking if the Plaintiff was "okay," following an obvious discussion with the Male, who (obviously) was moving away from, and complaining to the Flight Attendant about, the Plaintiff; having the woman in the bright orange pinny ask the Plaintiff to zip up; and the Flight Attendant returning to the back of the plane and telling the Plaintiff that she had to cover up, that the efforts she made were inadequate, and that she would have to put on her coat for the duration of the flight.

73.     When the Plaintiff calmly explained that she couldn't wear her coat due to the temperature in the aircraft, the Flight Attendant made it obvious that her answer was considered insubordinate and unacceptable.

74.     The Flight Attendant caused a second ruckus when she summonsed the Manager, who came to get the Plaintiff and escort her off the aircraft without explanation.

75.     The Manager had the option, but chose not, to permit the Plaintiff to remain on the aircraft once he saw that her top had been zipped up all the way.

76.     Upon information and belief, the Manager was partial to or on side with the Flight Attendant because of their status as coworkers and/or friends.

77.     Upon further information and belief, the Manager had the responsibility to investigate the matter to the extent that he was able—in this case, viewing the Plaintiff's clothing—before escorting her off the airplane.

78.     The Manager saw that the Plaintiff's clothing was flight-appropriate, yet asked her to exit the aircraft because he had predetermined that she would be kicked off.

79.     Upon information and belief, the Man who complained appeared to be of obviously higher economic and/or educational class than the Plaintiff, and therefore commanded positive attention.

80.     Upon information and belief, the Man told the Flight Attendant that the Plaintiff was dressed offensively and that he was uncomfortable sitting near her.

81.     While she had the discretion to offer the Man the option of changing seats once the cabin doors closed, the Flight Attendant had already noticed and negatively assessed the Plaintiff; and was happy to take the opportunity to embarrass her.

82.     The Flight Attendant elected to loudly ask the Plaintiff if she was "okay" out of spite, to embarrass her.  Though the Flight Attendant knew that the Plaintiff was not intoxicated or in a medically distressed state, she wanted to humiliate her without betraying that the Man had complained.

83.     The Flight Attendant elected not to ask the Plaintiff if she could zip up her top because she wanted to embarrass and humiliate her.  Instead of quietly explaining the situation to the Plaintiff, the Flight Attendant made a spectacle out of calling in a Maintenance worker who would catch the attention of everyone on the aircraft.

84.     The Maintenance worker woman merely asked that the Plaintiff cover up— something the Flight Attendant could have done but chose not to do.

85.     Though the Plaintiff's top was at that point zipped as high as it could go and was not revealing or offensive, the Flight Attendant returned and insisted that the Plaintiff had to cover up.

86.     The Flight Attendant knew, and intended, that the continued communications with the Plaintiff would cause a scene.  She also knew that the Man would have accepted and been fine with the Plaintiff behind him since she had zipped up her shirt.

87.     Out of anger and animosity, the Flight Attendant told the Plaintiff that she would have to wear her coat on the flight—a command that she knew was unreasonable, and further designed to humiliate the Plaintiff.

88.     The Flight Attendant's actions were calculated to cause the Plaintiff as much embarrassment and shame as possible because the Flight Attendant wanted to satisfy the  Male customer, and because the Flight Attendant prejudged and negatively assessed the Plaintiff.

89.     When the Plaintiff refused to don her coat for the duration of the flight given the temperature on the aircraft, the Flight Attendant became angry and retaliatory.  Though she could have asked if the Plaintiff had or would wear a t-shirt if given to her, the Flight Attendant very obviously went to summons the Manager.

90.     Upon information and belief, the Manager looked up the Plaintiff's flight information before responding and realized that she most certainly could not afford to rebook her ticket or miss the last flight to her destination that night.

91.     Upon information and belief, the Manager also knew that the Flight Attendant had a pattern and practice of treating certain women passengers in this manner and/or of being unnecessarily confrontational.

92.     Upon information and belief, the Flight Attendant untruthfully told the Manager that the Plaintiff was being obstinate and uncooperative, and refused to follow instructions.

93.     The Manager entered the plane after conferring with the Flight Attendant and having predetermined that the Plaintiff would be kicked off the plane.

94.     Though he knew or should have known that the Plaintiff was not violating AA policy and/or could have been given or asked to put on a t-shirt if necessary; and though he saw that the Plaintiff was causing no disruptions, the Manager immediately told the Plaintiff to gather her things and come with him.

95.     The Manager and the Flight Attendant intentionally exposed the Plaintiff to extreme public embarrassment and humiliation in retaliation for her perceived social class, educational background, physical appearance, and clothing choices.

96.     Neither the Flight Attendant nor Manager informed the Plaintiff that, if she did not put her coat on as requested, she would be removed from the aircraft and would forfeit her ticket.

97.     Upon information and belief, had the Plaintiff been African American, the Flight Attendant would not have drawn attention to or asked the Plaintiff to "cover up," and the Manager would not have asked the Plaintiff to leave the aircraft.

98.     Upon information and belief, had the Plaintiff been physically thin or "skinny," and/or had smaller breasts, the Flight Attendant would not have asked that she "cover up"; and the Manager would not have escorted her off the plane.

99.     Upon information and belief, had the Plaintiff appeared "professional," "educated," and/or of upper-middle class, the Flight Attendant would not have drawn attention to her, and the Manager would not has asked that she leave.

100.    Because of the Plaintiff's perceived status as (a) underclass; (b) uneducated; (c) overweight/voluptuous; and (d) Caucasian, the Flight Attendant and Manager determined that they would kick her off of the plan under the guise of wearing inappropriate clothing.

101.    Upon information and belief, neither the Flight Attendant nor Manager reviewed AA policies or procedures ahead of time, nor did either speak with an AA official or employee familiar with them.

102.    Upon information and belief, the Manager called and was in touch with AA and/or its staff before, during, and after these actions were taken.

103.    Upon information and belief, AA advised, directed, and/or condoned the Manager's actions in removing the Plaintiff from the flight, refusing to permit her travel, failing

to find her and pay for alternate transportation, not arranging and paying for overnight accommodations, not securing her ground transportation, not providing meals, and permitting her to be held for hours at the airport as it emptied for the night.

104.   The Defendants all acted with actual malice in forcing and allowing the Plaintiff to sit in the emptying and then emptied airport indefinitely.

105.   Upon information and belief, AA approved of, directed, and agreed with the actions that were taken.

106.   Upon information and belief, AA was put on almost immediate notice of the Plaintiff's treatment, but made no efforts to reach out or respond to her about what had occurred.

107.   As a result of the Defendants' malicious and intentionally humiliating actions, the Plaintiff suffered extreme emotional distress.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for such amount as is appropriate, with punitive damages, interest and costs.

<u>Count V</u>:
Negligent Infliction of Emotional Distress (All Defendants)

108.   The Plaintiff repeats the above allegations.

109.   AA owed the Plaintiff a duty of permitting her to fly on its aircraft when and if she had valid tickets for travel, and when and if she was otherwise compliant with terms thereof.

110.   AA owed the Plaintiff the further duty of training and instructing its employees as to the fair treatment of all races, genders, classes, and other types of persons flying on its airline; as well as the proper (and improper) bases for expelling a passenger from a plane.

111.    AA also owed the duty of "checking" its staff and correcting those who were attempting to apply rules improperly, unfairly, or unjustly.

112.    AA owed the duty to each passenger to ensure her safety was not unreasonably compromised by, *inter alia*, terminating travel plans, making no alternate arrangements, or leaving the passenger to fend for herself in a vacant airport in a strange city.

113.    Flight Attendant owed a duty to the Plaintiff to treat her fairly and equally, without regard to race, gender, appearance, or class.

114.    Flight Attendant owed a further duty to the Plaintiff not to embarrass, humiliate, retaliate against, penalize, or otherwise harm the Plaintiff for no justified reason.

115.    Flight Attendant owed a duty to ensure that rules that she was purporting to enforce were applicable to a given situation, and not to arbitrarily apply them.

116.    Manager had a duty to the Plaintiff to know and enforce the rules and regulations of the airline as written and intended, and equally.

117.    Manager had a duty to ensure that the Plaintiff was able to complete her travel plans without undue and improper interference.

118.    Manager owed the duty of investigating allegations made by staff, such as Flight Attendant, as to alleged passenger conduct before terminating a passenger's trip.

119.    Manager owed a duty of applying all airline rules and regulations fairly and without regard to race, gender, appearance, or class.

120.    Manager owed the Plaintiff the duty of explaining what would happen if she did not completely cover her chest; and the duty of offering for her to change her clothes or put on a t-shirt and giving her a chance to comply.

121. Manager owed a duty of ensuring that the Plaintiff was not stranded in the airport without alternate plans, a place to stay, ground transportation, food, and/or adequate funds.

122. In breach of the foregoing duties, the Defendants took actions so neglectful that they were virtually certain to result in great emotional distress to the Plaintiff. Among other things, the Defendants negligently trained on and applied the airline rules; allowed their internal prejudices to color application of those rules; failed to properly apply those rules; unfairly and callously removed the Plaintiff from the aircraft and did not allow her to reboard; did not rebook the Plaintiff; refused to pay or even arrange for the Plaintiff's lodging; failed to assist the Plaintiff in securing ground transportation; failed to ensure that the Plaintiff had a meal; and held the Plaintiff at the airport until the building was effectively empty.

123. The Plaintiff was substantially harmed as a result of the Defendants' individual and collectively negligent behaviors, which were predictably likely to cause substantial emotional distress.

124. The Defendants' breach caused the Plaintiff severe emotional distress.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for such amount as is appropriate, with interest and costs.

Count VI:
Negligent Supervision (AA)

125. The Plaintiff repeats the above allegations.

126. AA had a special relationship with the Plaintiff as an invitee of the airline.

127. Specifically, the Plaintiff was a member of the flying public, which pays AA as a common carrier.

128.    The Flight Attendant and Manager acted intentionally in singling out, humiliating, and discriminating the Plaintiff based upon her race, gender, appearance, and/or assessed class.

129.    The conduct described was within the scope of the Flight Attendant's and Manager's employment with AA.

130.    Upon information and belief, the Flight Attendant and/or Manager had a history of negative interactions with and treatment of persons of the Plaintiff's race, gender, appearance and/or class.

131.    The Flight Attendant and Manager were upon AA's premises (aircraft or gate), which was possessed by AA and which the Flight Attendant and Manager were privileged to enter only as servants or employees.

132.    AA knew that it had the ability to control the Flight Attendant and Manager.

133.    As a result of AA's negligent supervision, the Flight Attendant and Manager subjected the Plaintiff to unreasonable harm by causing her public humiliation, shame, and embarrassment, and behaving and speaking in such a way certain to inflict upon her emotional pain.

134.    The Plaintiff suffered unreasonable harm, and substantial emotional distress.

WHEREFORE, Plaintiff demands judgment against AA for such amount as is appropriate, with interest and costs.

Count VII:
Respondeat Superior (AA)

135.    The Plaintiff repeats the above allegations.

136.    At all times, the Flight Attendant and Manager were acting within the scope of their employment with AA.

137.   The complained-of conduct was the kind that the Flight Attendant and Manager were employed to perform.

138.   The complained-of conduct occurred substantially within the authorized time and space limitations of the Flight Attendant's and Manager's positions.

139.   The complained-of conduct was actuated, in least in part, by the purposes of AA.

140.   The conduct was intentionally used by the Flight Attendant and Manager against the Plaintiff, and such conduct was not unexpected by AA.

141.   The complained-of conduct was not so different from that authorized, far beyond the time or space limits, or too little actuated by a purpose to serve AA, so as to be outside the scope of the Flight Attendant's or Manager's employment.

WHEREFORE, Plaintiff demands judgment against AA for such amount as is appropriate, with interest and costs.

Count VIII:
Violation of 42 U.S.C. §1981 (AA)

142.   The Plaintiff repeats the above allegations.

143.   AA engaged in purposeful discrimination against the Plaintiff, by and through its staff.

144.   The discrimination was based on the Plaintiff's race (white), gender (female), appearance (overweight/voluptuous), and class (lower).

145.   The discrimination was committed in the course of the Plaintiff's acting pursuant to a contract with AA, to wit:  Making use of her ticket that she had purchased for travel.

146.   As a result of the Defendants' discriminatory conduct, the Plaintiff was repeatedly – and then permanently – prevented from contracting with AA.

147.    The discriminatory treatment and conduct was committed with malice or reckless indifference to the federally protected rights of the Plaintiff.

148.    As a result of the Defendants' conduct, the Plaintiff suffered inconvenience, mental anguish, emotional pain, and other nonpecuniary losses.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for such amount as is appropriate, with punitive damages, attorney fees, interest and costs; and requests injunctive relief prohibiting AA from continuing its discriminatory treatment of customers pursuant to 42 U.S.C.A. §1988(b).

Count IX:
Violation of 42 U.S.C.A. §1982

149.    The Plaintiff repeats the above allegations.

150.    The Plaintiff has the right, as citizen of the United States, in every State of the Nation, as is enjoyed by male, African American, skinny, middle-class citizens thereof, to purchase and make use of airline tickets with AA.

151.    The Plaintiff belonged to a protected class of persons (white/female/overweight and/or underclass).

152.    The Defendants had discriminatory intent.

153.    The Defendants interfered with the Plaintiff's rights connected with the purchase and use of its airline tickets.

154.    The Defendants acted with actual malice or reckless disregard for the Plaintiff's rights.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for such amount as is appropriate, with punitive damages, attorney fees, interest and costs; and

injunctive relief prohibiting AA from continuing its discriminatory racial profiling of customers

pursuant to 42 U.S.C.A. §1988(b).

Dated:  November 10, 2021.

_____

Jed Davis, Esq., Maine Bar No. 001686
Attorney for the Plaintiff

Jim Mitchell & Jed Davis, PA
86 Winthrop Street, Suite 1, Augusta, ME 04330
(207) 622-6339
jed@mitchellanddavis.com